## IN THE UNITED STATES BANKRUPTCY COURT

## FOR THE DISTRICT OF IDAHO

|  |  |  |
|---|---|---|
| IN RE | ) | |
| | ) | |
| SONCIA RAE BOREN, | ) | Case No. 05-20514-TLM |
| | ) | |
| | ) | |
| Debtor. | ) | MEMORANDUM OF |
| _____ | ) | DECISION |
| | ) | |
| | ) | |
| MARK LANSDOWNE, | ) | |
| JACQUELINE LANSDOWNE, | ) | |
| and JANET DUNNING | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| vs. | ) | Adversary No. 05-07018-TLM |
| | ) | |
| SONCIA BOREN, | ) | |
| | ) | |
| Defendant. | ) | |
| _____ | ) | |

## I.    INTRODUCTION

Mark and Jacqueline Lansdowne, along with Janet Dunning ("Plaintiffs")

obtained a state court default judgment for defamation against Soncia Boren

("Debtor").  Debtor filed a chapter 7 case on April 12, 2005.  Plaintiffs timely

brought this adversary proceeding to determine whether their defamation claim

may be excepted from discharge pursuant to § 523(a)(6).

On January 10, 2006, this Court conducted a one-day trial during which it

MEMORANDUM OF DECISION - 1

heard testimony from Plaintiffs, Debtor, and several other witnesses.  The matter

was taken under advisement on January 31, 2006, at the conclusion of post-trial

briefing.[1]  The Court has reviewed and considered all evidence, testimony and

arguments of the parties. The following constitutes the Court's findings of fact,

conclusions of law, and decision.  Fed. R. Bankr. P. 7052.[2]

## II.    FACTS AND BACKGROUND

This entire matter can be traced to a birthday party Debtor threw for a friend

on October 1, 2004.  The gathering included Debtor and three co-workers, plus a

fourth guest who was invited by one of Debtor's friends.  As might be expected,

food and drink were consumed to varying degrees.  Debtor allegedly made a

statement that found its way outside that gathering and back to Plaintiffs.  That

alleged comment quickly generated a lawsuit.

### A.    The actors

Several intertwined relationships are involved in this case.

### 1.    Soncia Boren and James Dunning

Debtor began working as a bus driver for the Lewiston School District in

September of 2002.  Her base of operations was the Transportation Center, also

---

[1]  Submissions after the post-trial briefing (*e.g.*, Adv. Doc. Nos. 62, 63) do not, in the Court's view, deserve comment or ruling.

[2]  As will become apparent, there was much conflicting testimony.  The Court observed and listened to the witnesses carefully, and its factual findings in this Decision reflect its evaluation of the credibility of each, and it determination of the weight to be given their testimony.  This is true even where such issues are not expressly discussed or evident from context.

known as the "bus barn."  At the time, Debtor was married to Bryan Boren

("Bryan").[3]  Soon after Debtor started working, James Dunning ("James") was

hired on as a bus driver.  He was at the time married to Plaintiff Janet Dunning

("Janet").

As 2003 progressed, both Debtor and James found trouble in their

marriages.  According to Debtor, she and James started talking frequently on the

phone and hanging out together during school field trips.  By December, the two

were involved in a sexual relationship.  According to Debtor, that aspect of the

relationship lasted under two months, ending in late January 2004.  However,

Debtor and James continued to talk on the phone in the ensuing months.

Though Debtor and Bryan attempted reconciliation in early 2004, they

ended up seeking a divorce.  That divorce was finalized on October 4, 2004, three

days after the party that stands at the nucleus of this action.

At some point during the relationship between James and Debtor, James

told her that he thought his wife, Janet, was having an affair with a co-worker.  At

trial, there was confusion as to whether the term co-worker meant someone who

worked with Janet or with James.

Debtor testified she had met Janet once briefly prior to the party, and had

seen her drive by the bus barn to drop off her kids.  Debtor testified she had never

---

[3] For clarity and ease of reading, the Court will at times refer to certain of the individuals
by the first names.

MEMORANDUM OF DECISION - 3

heard of the Lansdownes until the night of the party.

### 2.    Janet Dunning and James Dunning

Janet has been Mark and Jacqueline Lansdowne's housekeeper for nearly three years. She lives in a home on the Lansdowne's property, called Sondowne Ranch, with her three young children.

In April, 2004, Janet finalized her divorce from James. She testified it was a very contentious process, and that difficulties continued even after the divorce was over, especially regarding support and visitation. Mrs. Lansdowne testified that James called the house on several occasions, mostly about the Dunning's children, and sometimes late at night. Mrs. Lansdowne also testified that, at one point, she told James she would shoot him if he ever came onto the property.

In April, 2004, the same month as the divorce concluded, James told Janet he had been unfaithful during the marriage. Janet testified James did not mention a name, and she did not ask for one. However, Janet found out in September, 2004 that the other woman was, in fact, Debtor.

### 3.    Janet Dunning and Bryan Boren

The purveyor of this information was none other than Bryan Boren, Debtor's estranged husband. Bryan relayed this news when he ran into Janet at the Nez Perce County Fair. Janet testified Bryan also gave her his phone number, although she never used it. Bryan later told Debtor about the encounter. Based on that conversation, Debtor testified she thought her ex-husband was either dating or

MEMORANDUM OF DECISION - 4

trying to date Janet in order to get even with her for the affair with James.

### 4.    Karen Wittman

Karen Wittman is a mail carrier in Lewiston.  Plaintiffs are among the customers along her route.  Wittman testified she was friendly with the Lansdownes and, on occasion, she would be invited into their house when delivering packages.  She was also acquainted with Janet.

Wittman is also a friend of Bev Mundell.  Mundell is another bus barn employee.  Sometime prior to October 1, 2004, Mundell invited Wittman to Debtor's party.  Both Debtor and Wittman testified they had heard of each other, but never actually met until the night of the party.

### B.    The party

Debtor had organized the party to celebrate Ginger Pettingill's birthday.  In addition to Pettingill, Debtor invited Mundell and Colleen Schmidt.  All four women worked at the bus barn.  Mundell invited Wittman.

Although the testimony varies, the party got underway sometime between 5:00 and 5:30 p.m.  Mundell was the first to arrive.  Pettingill and Schmidt arrived next, followed by Wittman, who showed up sometime between 6:00 and 7:30 p.m.

Just how much alcohol was consumed, and by whom, was subject to debate at trial.  The answer remained unclear despite much interrogation.

Wittman testified she brought a bottle of Tequila and some lemonade, but that she had not been drinking prior to her arrival.  Wittman further testified she

MEMORANDUM OF DECISION - 5

consumed just half a glass of a Tequila and lemonade mixed drink at the party.
However, Debtor, Mundell and Schmidt all testified that it appeared to them
Wittman had been drinking beforehand.  They also say she was fairly intoxicated
when she left the party.

By all accounts, Mundell had consumed one or two drinks by the time
Wittman arrived, and continued drinking steadily.  All agree Mundell was
intoxicated when Wittman gave her a ride home later that night.  Mundell did not
really disagree, except in regard to characterizing how intoxicated she was.

Schmidt testified she had one drink the entire night, and that Debtor and
Pettingill each had a couple of drinks.

When Wittman arrived at Debtor's home, the other guests had already eaten
and were sitting around talking.  Between 15 and 20 minutes later, Bryan called
Debtor.  The conversation between the two, whose divorce would be final within a
matter of days, was brief.  Once Debtor hung up, Bryan became the topic of
conversation.  That led Debtor to mention Bryan's recent encounter with Janet
Dunning at the county fair, and Debtor then wondered aloud how "ironic" or
"funny" it would be if Janet and Bryan "got together."[4]

The events following this statement are subject to much testimonial

_____

[4]  The irony, to Debtor, would be in her soon-to-be ex-husband having a relationship with
her ex-lover's ex-wife.  Her comment at the party, though, was not that explicit.  Debtor testified
that none of the guests at the party actually knew about her affair with James, although she says
they were aware that other people had accused her of having the affair.

MEMORANDUM OF DECISION - 6

disagreement.

Wittman testified that Debtor started making rude remarks about Janet's body.  Schmidt testified that "someone" made fun of Janet's appearance.  Debtor denies saying anything about Janet.

Then, Wittman claims, Debtor told everyone that Janet was sleeping with her "boss."  Wittman claims to have been stunned and disgusted by the statement, but continued listening without saying anything.  Wittman further testified that she never discussed the Lansdownes.

Debtor, Mundell and Schmidt paint a different picture.  They say that, once Janet's name was mentioned, Wittman broke into the conversation, claiming to "have the dirt" on Janet.  According to all three witnesses, Wittman spent the next 10 to 15 minutes talking about all three Plaintiffs.[5]  In particular, they remember Wittman saying the Lansdownes had surveillance cameras all over their property, and were watching Janet.  These witnesses further agree that, after awhile, everyone became bored with Wittman's story because no one knew Janet very well, or the Lansdownes at all.  Importantly, each denies that Debtor ever said Janet was sleeping with her boss.

## C.    The Aftermath

A few days after the party, Wittman delivered a package to the

---

[5] Debtor remembers Wittman specifically referring to "Jackie," presumably a reference to Jacqueline Lansdowne.

MEMORANDUM OF DECISION - 7

Lansdownes.  She took that opportunity to tell Mrs. Lansdowne about Debtor's

alleged comment.  Mrs. Lansdowne was predictably upset.  Janet testified Mrs.

Lansdowne called her later that day with the news.[6]  Mrs. Lansdowne told Mr.

Lansdowne at some point later on.

Plaintiffs quickly retained an attorney, who wrote Debtor a letter dated

October 8, 2004 – one week after the party.  The letter states in pertinent part:

> My clients are, quite understandably, extremely upset as a result of
> learning of the dissemination of these outrageous falsehoods.  They
> have instructed me to give you one opportunity to address this
> problem short of litigation. If you will provide information about the
> source of the statements you are accused of making, promise to not
> make such statements ever again and provide a written apology to
> the Lansdowne's, then they will agree to not file a lawsuit against
> you.

Ex. A.[7]  Debtor said she talked to an attorney about dealing with this letter and

thought he wrote a response.  There is no evidence, however, of any response

being given.  Mrs. Lansdowne also called the bus barn wanting to talk with

Debtor, but to no avail.

Around this time, Wittman and Debtor ran into each other at a local Wal-

Mart.  It is unclear exactly what was said, but based on the testimony it is safe to

---

[6] Mrs. Lansdowne testified at the state court damages hearing that she was sitting in her living room with Janet when Wittman broke the news.  At trial, Mrs. Lansdowne said that the three of them were together in the living room talking about the incident, but this was later in the week, after Wittman had revealed Debtor's alleged comments.

[7] Plaintiffs were convinced that James Dunning was the source of this comment. Relations and communication between Janet and James, and to some degree Mrs. Lansdowne and James, were strained and even hostile.  The letter appeared designed to force Debtor to identify James as the rumor's source.

MEMORANDUM OF DECISION - 8

conclude Debtor expressed her displeasure with what Wittman told Plaintiffs.[8]

True to their demand letter, Plaintiffs filed suit[9] on November 18, 2004. Ex. 1.  Debtor was served on December 2, 2004, but never responded.  Ex. 3. Plaintiffs received an "Order of Default" on January 3, 2005.  Ex. 4.  Following a damages hearing on February 25, 2005, judgment was entered for $11,785.25.[10] The state court judge made no findings of fact or conclusions of law regarding liability on the defamation claim.

Debtor's chapter 7 petition was filed on April 12, 2005.  Plaintiffs filed their adversary complaint alleging that the defamation judgment should be excepted from discharge pursuant to § 523(a)(6), and that the state court judgment should be given preclusive effect as to the question of damages.

## III.    DISCUSSION AND DISPOSITION

### A.    Burden of proof

It is a long-standing and well-accepted policy that exceptions to

---

[8]  Debtor does admit saying something to the effect of "why are you causing this trouble" to Wittman.  Wittman testified at Plaintiffs' state court damages hearing that she thought Debtor was drunk when she saw her at Wal-Mart.  Wittman also testified Debtor told her about the affair with James.

[9]  All three Plaintiffs sued.  As mentioned above, Debtor allegedly said Janet was sleeping with her "boss."  The standing of Janet and Mr. Lansdowne to complain seems clear.  At both the state court damages hearing and at trial before this Court, Jacqueline Lansdowne testified *she* was Janet's boss and not a "switch-hitter."  Absent an interpretation of Debtor's alleged comments as suggesting Mrs. Lansdowne was engaged in a homosexual relationship with Janet, Mrs. Lansdowne might not have standing to bring a defamation action in the first place.

[10]  This included $10,500 in damages, $1,186.25 in attorney's fees, and $99 for filing fees and service.  Ex. 6.

MEMORANDUM OF DECISION - 9

dischargeability should be strictly construed in order to serve the Code's purpose of giving debtors a fresh start. *Massie v. Pate (In re Pate)*, 262 B.R. 825, 830 n.5, 01.2 I.B.C.R. 59, 61 n.5 (Bankr. D. Idaho 2001); *Spokane Ry. Credit Union v. Endicott (In re Endicott)*, 254 B.R. 471, 475 n.5, 00.4 I.B.C.R. 199, 200 n.5 (Bankr. D. Idaho 2000) (citing *Snoke v. Riso (In re Riso)*, 978 F.2d 1151, 1154 (9th Cir. 1992)). A creditor bringing a § 523(a)(6) action must prove its cause by a preponderance of the evidence. *Pate,* 262 B.R. at 830 n.5 (citing *Grogan v. Garner*, 498 U.S. 279, 287-88 (1991)). The preponderance standard requires the trier of fact to believe the existence of a fact is more probable than not. *Merkel v. Commissioner*, 192 F.3d 844, 852 (9th Cir. 1999). In other words, there must be affirmative proof "sufficient to persuade the finder of fact that the proposition [urged] is more likely true than not." *Arnold v. Gill (In re Arnold)*, 252 B.R. 778, 784 n.10 (9th Cir. BAP 2000). If the evidence on both sides is evenly balanced, the party holding the burden of persuasion must lose. *Director, Office of Workers' Comp. Programs v. Greenwich Collieries*, 512 U.S. 267, 281 (1994).

> **B.    Credibility of witnesses**

In weighing the credibility of a witness, the Court must examine the details of the evidence they present, including factual inconsistencies, and may also consider all aspects of their testimonial behavior including responsiveness to questioning, evasiveness, variations in demeanor, and changes in tone of voice.

MEMORANDUM OF DECISION - 10

*See*, *e.g.*, *Anderson v. City of Bessemer*, 470 U.S. 564, 575 (1985).  The Court can

assess credibility not only based upon the content of the testimony but also on the

Court's own experience with the way people act.  *Maynard Sav. Bank v. Banke (In*

*re Banke)*, 275 B.R. 317, 328 (Bankr. N.D. Iowa 2002).  Furthermore, it has been a

long-standing rule that the trier of fact is generally "free in the exercise of their

honest judgment, to prefer the testimony of a single witness to that of many."

*Weiler v. United States*, 323 U.S. 606, 608 (1945).

### C.      Defamation under § 523(a)(6)

To bring a successful defamation action, the plaintiff must prove: (1) a false

and defamatory statement was made concerning plaintiff, (2) the publication was

unprivileged and made to a third party, (3) the fault of the publisher amounts to at

least negligence, and (4) either special harm exists, or the statement is actionable

irrespective of special harm (*i.e.*, defamation per se).  *See* Restatement (Second) of

Torts § 558 (1977)*; see also Wiemer v. Rankin*, 790 P.2d 347 (Idaho 1990)

(discussing libel),  *Barlow v. Int'l Harvester Co.*, 522 P.2d 1102 (Idaho 1974)

(discussing slander).[11]

---

[11]  Defamatory communication can come in the form of libel or slander.  Restatement
(Second) of Torts at § 568.  Slander generally involves the publication of defamatory matter by
"spoken words," whereas libel consists of written or printed words.  *Id*.  The instant case sounds
in slander notwithstanding some of the characterizations in briefing that the statements are
"libelous."  Four categories of communication are defamatory per se.  *Barlow*, 522 P.2d at 1111.
They are: (1) allegations of "serious sexual misconduct," (2) imputation of a "criminal offense,"
(3) imputation of a loathsome disease, and (4) matter that is incompatible with a person's
business, trade, profession, or office.  Restatement (Second) of Torts at §§ 570-74.

MEMORANDUM OF DECISION - 11

However, to prevail under § 523(a)(6),[12] a plaintiff must show the debtor inflicted an injury that was both "willful" and "malicious." *Jett v. Sicroff (In re Sicroff)*, 401 F.3d 1101, 1106 (9th Cir. 2005); *see also Dominguez v. Elias (In re Elias)*, 302 B.R. 900, 906-07, 03.4 I.B.C.R. 243, 245 (Bankr. D. Idaho 2003).  In *Elias*, this Court held:

> In this Circuit, [§ 523(a)(6)'s] language has been interpreted to require that the court apply a two-pronged test in determining the dischargeability of a debt.  The first prong requires a creditor to prove that a debtor's conduct in causing the claimant's injuries was willful.  The second prong requires a creditor to prove the debtor's conduct was malicious.  *Carrillo v. Su (In re Su)*, 290 F.3d 1140, 1146-47 (9th Cir. 2002).
>
> To satisfy the willfulness prong, the creditor must prove that the debtor deliberately or intentionally injured the creditor, and that in doing so, the debtor intended the consequences of his act, not just the act itself.  *See Kawaauhau v. Geiger*, 523 U.S. 57, 61-62 (1998).  Elaborating on the debtor's state of mind required by the statute, the Ninth Circuit has explained that a debtor must possess a subjective motive to inflict injury, or believe that injury is substantially certain to result from his conduct.  *In re Su*, 290 F.3d at 1143.  Thus, a creditor cannot prevail in an action brought under § 523(a)(6) unless it is shown that the debtor had actual knowledge that harm to the creditor was substantially certain to occur from the debtor's acts.  *Id.* at 1145-46.  However, actual knowledge may be shown through circumstantial evidence of "what the debtor must have actually known when taking the injury-producing action . . . ."  *Id.* at 1146 n.6.
>
> To satisfy the malicious prong, the creditor must prove that

---

[12] Section 523(a)(6) states:

A discharge under section 727. . . of this title does not discharge an individual debtor from any debt – (6) for willful and malicious injury by the debtor to another entity or to the property of another entity.

MEMORANDUM OF DECISION - 12

the debtor's conduct involved: (1) a wrongful act; (2) done intentionally; (3) which necessarily causes injury; and (4) is done without just cause or excuse. *Id.* at 1146-47.

302 B.R. at 907. *See also In re Sicroff,* 401 F.3d at 1106.

Here, therefore, Plaintiff must show that the slanderous statement was made (*i.e.*, "published") by Debtor and, if so, that the elements of § 523(a)(6) are met.

### D.    Application of the standards to the evidence

#### 1.    The conflicting testimony

Plaintiffs have produced a single witness who claims to have heard Debtor say at the party, soon after Bryan's call, that Janet was sexually involved with her boss. This comment, according to Wittman, was made in close proximity to insults Debtor leveled against Janet.

Meanwhile, Debtor, Mundell and Schmidt each claim the statement about Janet sleeping with her boss was never made.[13]

Furthermore, these three have fairly consistent accounts of the progression of the discussion after Wittman arrived. Schmidt, Debtor and Mundell all testified: (1) Bryan called Debtor's home; (2) the phone call turned the party's topic of conversation to Bryan[14] and, subsequently, to his meeting with Janet at the fair; (3) Debtor made the comment about how "funny" or "ironic" it would be if those two

---

[13] Schmidt's testimony supports, partially, one component of Wittman's account – that "someone" made fun of Janet's appearance.

[14] Debtor and Wittman both testified that following the phone call, Wittman expressed some concern that Bryan might come over.

MEMORANDUM OF DECISION - 13

got together; (4) Wittman broke in, saying she had the "dirt" on Janet; (5) Wittman talked for 10 to 15 minutes about Plaintiffs; and (6) everyone became bored with Wittman's story because no one at the party, except Wittman, knew Janet very well, or had even heard of the Lansdownes.  The witnesses recounted these details outside the presence of one another.[15]

Plaintiffs argue Wittman had no reason to invent her allegation of overhearing the statement.  Certainly, there was no proof of such a motive introduced.  They also contend Debtor's alleged comment is remarkably similar to a statement Debtor admits James made to her about Janet sleeping with a "co-worker," implying that Debtor simply, but inaccurately, repeated a slur she had been told.  There is indeed some similarity between what James said and what Debtor is alleged to have said.

On the other hand, Debtor's testimonial denial of making the statement does not stand alone.  Two other witnesses provided fairly consistent accounts of the conversation at issue, directly contradicting Wittman.

Plaintiffs make clear their belief that Debtor, Mundell and Schmidt have manufactured a story.  Plaintiffs necessarily contend, therefore, that each of these three witnesses gave knowingly false testimony under oath.  The Court has considered that serious contention while attempting to evaluate all the evidence,

---

[15]  The Court granted Plaintiffs' request that witnesses be excluded from the courtroom during trial except when testifying.

including indications of testimonial credibility of every witness.

### 2.    Debtor's failure to respond to Plaintiffs' demand and suit

Plaintiffs also argue if Debtor really was innocent of making the defamatory statement, she would naturally want to set the record straight. They claim she had two chances to do so prior to litigation, and another in the state court action, and that her failure to do so belies her claim of innocence.

Plaintiffs' demand letter, gave Debtor "*one opportunity* to address this problem short of litigation," and instructed her to respond to the Lansdowne's *attorney* within 10 days. This kind of letter could be viewed as intimidating just as easily as it can be viewed as an invitation to cooperate to "clear up a misunderstanding." Such a communication – coming from an attorney – also puts the recipient on notice that Plaintiffs have already taken the "misunderstanding" to the next level. And, under the circumstances and given the tenor of the letter, Debtor may have disbelieved the promise not to sue. It would be understandable why Debtor might not respond, at least without legal assistance.[16]

The second pre-suit chance Debtor had to respond, according to Plaintiffs, came when Mrs. Lansdowne called Debtor at the bus barn. But Debtor testified that the secretary who took the call described the caller and the message as hostile. It is not entirely clear whether the phone call occurred before or after the receipt of

---

[16]  Debtor testified that she believed attorney Tom Callery was preparing a letter in response. She did not prove any such letter was actually sent.

MEMORANDUM OF DECISION - 15

the letter, though it appears to have been close in time.  Either way, Debtor's reluctance to personally return the call was understandable.

As to her failure to defend the state court action, Debtor claims a lack of funds needed to hire a lawyer and also a lack of appreciation for the law and the seriousness of the filed action.  Her lack of resources with which to contest a lawsuit is not contradicted.  While her failure to answer the suit, even if that needed to be on a pro se basis, shows questionable judgment, it does not add much to Plaintiffs' contention that Debtor actually made the statements at issue.

### 3.    Plaintiffs' theories regarding Debtor's motive

There was no evidence presented to establish why Debtor would harbor such ill will toward Janet that she would volunteer a false and defamatory statement about her, especially in a group containing someone she had just met.

Plaintiffs point out that James had told Debtor he suspected Janet was sleeping with a co-worker.  Plaintiffs theorize that Debtor was bitter about her ex-husband's attempts to date Janet, and that Debtor somehow twisted the information she received from James, and said Janet was sleeping with her boss.

However, at the October 1 party, Debtor was three days away from finalizing her divorce from Bryan.  Furthermore, she had ended some 8 months earlier her affair with Janet's husband.  Nothing was presented that would lead to the conclusion Debtor was concerned one way or the other about a present or future tryst between Bryan and Janet.  As Debtor noted, it would have been ironic,

MEMORANDUM OF DECISION - 16

but nothing more.

The Court has the unenviable task of determining where the truth lies
amidst these several versions of events.  The attempts of the parties to bolster and
impeach witnesses' credibility, the competing assertions of motive and enmity, and
the stark differences in testimony have made the task quite difficult.

In evaluating and reconciling all that has been presented and argued, the
Court concludes the account of the events of October 1, 2004, from Debtor and
two other witnesses is just as likely to be true as that of Plaintiffs' witness.
Accordingly, it finds Plaintiffs have not met their burden to prove by a
preponderance of the evidence[17] that Debtor made the statement at issue in this
case.

## IV.    CONCLUSION

Plaintiffs have not proven that Debtor published the defamatory statement
at issue in this case.[18]  Accordingly, the Court need not proceed to address the
standards of willfulness and maliciousness under § 523(a)(6).

---

[17] *See* discussion at III.A, *supra*.

[18] Plaintiffs have not argued the Court should give preclusive effect to the state court
judgement as to liability on the defamation claim.  In fact, they conceded in a memorandum filed
earlier in this case that "Ms. Boren is entitled to defend this action on the matter of liability for
defamation[.]"  Adv. Doc. No. 34 at 3.  They did so again in their post-trial brief, setting out the
elements of defamation and arguing, "[t]he question here is whether the evidence weighs in favor
of a factual finding that the statement was made.").  Adv. Doc. No. 61 at 3.  Plaintiffs do contend
the dollar amount awarded following the state court damages hearing should not be relitigated.
However, since the Court concludes Plaintiffs have failed to meet their burden as to liability, any
issues regarding the preclusive effect of the state court's damages finding is rendered moot.

MEMORANDUM OF DECISION - 17

Judgment will be entered for Debtor, and her debt to Plaintiffs will be held

discharged under her previously issued discharge.

DATED:  February 14, 2006

TERRY L. MYERS
CHIEF U. S. BANKRUPTCY JUDGE

MEMORANDUM OF DECISION - 18